Filed 8/20/14  P. v. Roston CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CEBRAM LAWRENCE ROSTON,<br><br>        Defendant and Appellant. | A136743<br><br>(Lake County Super. Ct.<br> No. CR929359) |

Cebram Lawrence Roston appeals from a conviction of robbery.  He contends he received ineffective assistance of counsel in that his attorney failed to move to suppress his statement to the police as fruit of a warrantless entry into his home.  He additionally contends the trial court erred in refusing to allow him to introduce evidence of the complaining witness's prior accusations of being victimized and, in the alternative, that his attorney rendered ineffective assistance of counsel in failing to explicitly challenge this ruling on constitutional grounds.  We affirm.

**STATEMENT OF THE CASE**

An information filed on May 3, 2012, charged appellant with one count of robbery (Pen. Code, § 211) and alleged he had served one prior prison term (§ 667.5, subd. (b).)  Appellant was found guilty as charged on July 20, 2012, after a jury trial, and then admitted the prior prison term.  He was sentenced on September 26 to a total prison term of six years, consisting of the aggravated term of five years for the robbery and an additional year for the prison enhancement.  Appellant filed a timely notice of appeal on September 27, 2012.

1

**STATEMENT OF FACTS**

Jerry Maggio testified that on April 8, 2012, between 11:00 and 11:30 p.m., he was standing outside the side of the Safeway in Clearlake eating some cereal. He noticed a car pull up to the front of the store and saw two people get out. Appellant, with whom Maggio had gone to high school, got out and walked toward the front of the store while the driver stood by the back of the vehicle.

About six minutes later, appellant walked up to Maggio and, without saying anything, punched him in the face. Maggio fell. Appellant grabbed his jacket with both hands, shook him, and said loudly, "Give me your money." Maggio said his spine was injured and asked appellant not to hurt him. Appellant shook Maggio several more times, each time demanding money and each time Maggio saying he did not have any. Appellant reached into Maggio's right pants pocket with his right hand and felt around, and shook Maggio several more times, lifting him more than a foot and a half off the ground and hitting his lower spine on the concrete. After the seventh shaking, appellant pulled out of Maggio's right pocket a plastic Safeway shopping bag containing an insurance card, a bank card, some appointment cards, some receipts, a flashlight and a lighter. Appellant threw the bag to his right and Maggio's bank card, drivers license, two appointment cards and two receipts fell out. Appellant then reached into Maggio's left pants pocket and ripped it upward, ripping the pants from the pocket to the leg area and across to the waist. Appellant shook Maggio again, Maggio again said he had no money, and appellant ripped open Maggio's jacket, which had been zipped and buttoned, and felt around the inside of the jacket. Appellant released Maggio, who fell to the ground, stepped to his right, picked up the plastic bag with Maggio's belongings, and left in the car, which had pulled around from the parking lot. Maggio never got back his lighter, his flashlight, some of his appointment cards, his insurance card or his bank card. Although he initially testified only that appellant picked up the bag and took it with him when he left, he later testified that appellant also picked up the bank card that had fallen on the ground and took that as well.

Maggio got up and picked up a receipt he had seen fall out of appellant's pocket, as well as two appointment cards that appellant had dropped. A woman who worked in the store approached and asked Maggio if he was okay and if he wanted to contact the police. He went into the store with her and she called the police, who arrived a few moments later. Maggio explained to Officer Cook what had happened. The officer left, then returned later and showed Maggio some photographs. Maggio identified appellant and gave Cook the receipt that appellant had dropped.

Maggio had not been drinking alcohol or taking any medication before the assault.

On cross examination, defense counsel elicited Maggio's testimony that he had talked to Officer Cook and to the prosecutor the day before but did not discuss the questions he would be asked when he testified. Maggio had trouble remembering the specific conversations, saying he had spoken with the prosecutor more than once and with Cook more than five but not more than seven times, not six times, and finally estimating nine times. Maggio said Cook had talked to him the day before about 13 photographs that defense counsel showed him. He acknowledged having testified in an earlier proceeding that appellant lifted him off the ground at most six to eight inches, whereas at trial he said it was at least one and a half feet. Maggio testified that he had not taken any medication within the past 24 hours that might affect his ability to remember and communicate the events of April 8, 2012, including Vicodin or other pain killers. When defense counsel asked whether Maggio had been the victim of another assault, the court sustained the prosecutor's relevance and Evidence Code section 352 objections.

Sandra Kirby, a Safeway employee, was in the parking lot around 11:00 p.m. on April 8, 2012, returning her shopping cart after putting groceries in her car. She heard a person saying "I don't have any money, dude" and looked over to see Maggio, whom she knew as a regular Safeway customer, being assaulted about 150 feet away. The assailant was bent over, holding Maggio's jacket with both hands and "picking him up and slamming him on the ground." Kirby could not see who the assailant was or whether he was reaching into Maggio's pocket. Kirby yelled "hey, stop" and turned around to get

3

her cell phone from her car and call the police. She then saw the assailant run to the end of the parking lot, get in the passenger side of a car and leave.

Kirby called to Maggio, who was standing and picking up a few cards that had been in his pocket, asking if he was alright. When she got over to him, Maggio was holding the side of his face; he asked if it was swollen because he had been punched. Maggio's pants were torn along the seam by the pocket. Kirby and Maggio went into the store and Kirby called the police.

David Lewis, who was working as a checker at the Safeway on the night of April 8, 2012, testified that a large black male wearing a blue shirt with white lettering or design on the front bought some candy on his line that night. Lewis identified the receipt Maggio had given to Cook, which showed the time 11:22 p.m., as being the time when the man bought the items. The man did not appear to have been drinking. Lewis testified that it was possible appellant was the man he saw, but he saw too many faces each day to be sure.

Joseph Flores testified that he drove to Safeway with appellant on April 8. He parked in front of the store and appellant got out of the car. About eight or nine minutes later, Flores saw appellant hit a man at the corner of the store. The man fell to the ground.[1] Flores pulled the car over and told appellant to stop; appellant got in, and they left. Flores asked appellant why he had beaten the man and appellant said he was "stressed out about needing money" and was "angry and took it out on the first person he seen." Asked if he had told the police that appellant said "I'm mad and I need someone's money," Flores stated, "if that's what's in the report that's—I guess that's probably what I said, but, you know, he's just stressed because he needed money, you know really."

Flores had been convicted of two felonies, burglary in 1996 and receiving stolen property in 2007, and four misdemeanors, accessory after the fact in 2000, vandalism in

---

[1] When interviewed by the police that night, Flores said that appellant had knocked the man down and "started slamming him into the ground[]" but he testified that this was a bad choice of words; the man was holding onto appellant and appellant was "shaking him off."

2003, automobile theft in 2005, and receiving stolen property in 2012. He was on probation at the time he testified. He had known appellant since he was a kid and did not want to see anything bad happen to him.

Police Officer Elvis Cook was dispatched to the Safeway about 11:33 p.m. on April 8, where he interviewed Maggio, Kirby, and Lewis. Maggio, who appeared upset and distressed, had a cut on his lip and slight redness on his cheek and lip area, and his pants pocket was ripped open. He told Cook what had happened and identified his assailant as "Larry," which the parties had stipulated was the name by which appellant was known in the community. From Maggio's description, Cook believed he knew who the suspect was, so he returned to the police station and compiled a photographic lineup to show Maggio. He returned to the scene, and Maggio identified appellant's photograph. During this second interview, Maggio gave Cook a Safeway receipt he said appellant had left at the scene.

Cook went to Flores's house, spoke with him and photographed his car, which was parked in front. He then went to appellant's house, next door to Flores's, arriving there about 1:05 or 1:10 a.m. on April 9. Appellant was asleep when Cook arrived. Once woken, appellant showed signs of having consumed alcohol but did not appear highly intoxicated; his demeanor, balance and speech were "normal." Appellant was wearing clothes that matched the description Maggio and Lewis had given to Cook. The police did not search appellant's home, but saw a plastic Safeway bag in plain sight. None of the items Maggio reported being stolen were recovered.

Cook's contact with appellant was captured on an audio recording, which was consistent with Cook's description. Asked to tell Cook what happened at Safeway, appellant said, "I'm a little upset that my money wasn't on my card and that was it. [¶] . . . [¶] I spent more, spent my, more money than I thought and . . . ." Cook queried, "So you were a little upset 'cause you didn't have any money?" Appellant replied, "Yes sir." Appellant said he had drunk "[a]lmost a thirty pack" that night, commenting that it was his birthday. Appellant said he had walked to Safeway by himself. He initially said he did not buy anything, then when told that the store camera showed him buying

5

something and Cook had the receipt, appellant said he bought Snickers bars.[2] Appellant acknowledged pushing and hitting Maggio, grabbing him by the jacket and yelling at him, but did not remember what he yelled and denied taking anything from him.

## DISCUSSION

### I.

Appellant contends he received ineffective assistance of counsel in that his attorney did not move to suppress his statement to the police on the basis that it was obtained as a result of an unlawful warrantless entry into his home.

On July 9, 2012, appellant filed a motion in the trial court seeking to suppress all evidence obtained from him on the grounds that the police lacked probable cause to detain appellant and unreasonably acted without a warrant. On July 12, defense counsel told the court she had erred in not filing the motion earlier and asked the court to hear it despite it being untimely. The court questioned whether it had jurisdiction to do so. After discussing the matter with appellant and defense co-counsel, appellant's attorney stated that they had decided to withdraw the motion to suppress because the argument was "legally weak" in light of "the underlying legal authority for exigent circumstances in pursuit of a fleeing felon." Counsel instead pursued an alternative argument that appellant did not validly waive his *Miranda*[3] rights.

"Establishing a claim of ineffective assistance of counsel requires the defendant to demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 694; *In re Wilson* (1992) 3 Cal.4th 945, 950.) A 'reasonable probability' is one that is enough to undermine confidence in

---

[2] Cook's statement about the camera was not true; it was a "ruse" to make appellant "more forthcoming."

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

6

the outcome.  (*Strickland*, . . . at p. 694; *In re Jones* (1996) 13 Cal.4th 552, 561.)"
(*People v. Dennis* (1998) 17 Cal.4th 468, 540-541.)

"When a defendant claims ineffective assistance of counsel based on his counsel's failure to bring a motion to suppress evidence on Fourth Amendment grounds, the defendant is required to show that the Fourth Amendment claim had merit."  (*People v. Frye* (1998) 18 Cal.4th 894, 989, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  Defense counsel told the trial court she was withdrawing the suppression motion because the Fourth Amendment claim was "weak" in light of legal authority for "exigent circumstances in pursuit of a fleeing felon." Appellant argues that defense counsel's decision to withdraw the suppression motion was not a reasonable tactical decision and that counsel was incorrect in assessing the basis of the motion as "weak."

" 'It is axiomatic that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." ' (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 748.)  A warrantless entry is 'presumptively unreasonable.' (*Payton v. New York* (1980) 445 U.S. 573, 586.)  This presumption can be overcome by a showing of one of the few 'specifically established and well-delineated exceptions' to the warrant requirement (*Katz v. United States* (1967) 389 U.S. 347, 357), such as ' "hot pursuit of a fleeing felon, or imminent destruction of evidence, . . . or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling" ' (*Minnesota v. Olson* (1990) 495 U.S. 91, 100).  The United States Supreme Court has indicated that entry into a home based on exigent circumstances requires *probable cause* to believe that the entry is justified by one of these factors . . . .  (*Ibid*.)"
(*People v. Celis* (2004) 33 Cal. 4th 667, 676.)

"[I]n appropriate circumstances the fresh pursuit of a fleeing felon may constitute a sufficiently grave emergency to justify an exception to the warrant requirement and make it constitutionally reasonable for the police to enter a private dwelling without prior authorization of a magistrate.  (See, e.g., *Coolidge v. New Hampshire* (1971) 403 U.S. 443, 481; *Warden v. Hayden* (1967) 387 U.S. 294, 298-299; *People v. Wetzel* (1974) 11

7

Cal.3d 104, 108 & fn. 4; *People v. Dumas* (1973) 9 Cal.3d 871, 882.) 'There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.' (*People v. Ramey* (1976) []16 Cal.3d 263, 276.)" (*People v. Escudero* (1979) 23 Cal.3d 800, 808-809.) "[A]lthough 'fresh pursuit' of a fleeing felon must be substantially continuous and afford the law enforcement authorities no reasonable opportunity to obtain a warrant, it is not necessary that the suspect be kept physically in view at all times." (*Escudero*, at p. 810.)

It is questionable whether the "fresh pursuit" doctrine would apply in the present case, because "there was no immediate or continuous pursuit of the [suspect] from the scene of a crime." (*Welsh v. Wisconsin*, *supra*, 466 U.S. at p. 753.) There was an immediate, continuous and expeditious investigation that led the police to appellant's home within a short time, but the "pursuit" characterization is not accurate.

Nevertheless, appellant has not demonstrated he had a meritorious Fourth Amendment claim. First, the warrantless entry may have been permissible due to the implied consent of appellant's girlfriend, Canevari. Consent is a recognized exception to the Fourth Amendment's warrant requirement, and that consent may be given by a third party " 'who possesses common authority over the premises.' " (*People v. Superior Court (Walker)* (2006) 143 Cal.App.4th 1183, 1198, quoting *Illinois v. Rodriguez* (1990) 497 U.S. 177, 181.) It may be inferred from the fact Canevari and appellant lived together that Canevari possessed authority to consent to the officers' entry into their joint home. (*People v. Frye, supra,* 18 Cal.4th at p. 990.) Consent to enter may be express or implied. (*Ibid.*)

Respondent maintains that it is inferable from the transcript of the recorded encounter at appellant's home that Canevari permitted the officers to enter and led them to the bedroom where appellant was sleeping. The transcript reflects that when Canevari answered the door, Cook asked for appellant and she said he was sleeping. Cook asked where he was, Canevari said appellant's name, Cook asked Canevari to "step on out here," Canevari said appellant's name again, Cook and another officer repeated, "Ma'am,

8

come out here," Canevari said, "sorry," and Cook asked appellant to stand up.[4]  The

recording of this exchange demonstrates that it happened quickly; less than 16 seconds

_____

[4] The transcript reflects the following encounter:

"[Knocking].

"Canevari:     Who is it?

"Cook:          Police department.

"Canevari:     Yes?

"Cook:          Hello.

"Canevari:     Hi.

"Cook:          Is Larry here?

"Canevari:     He's sleeping.

"Cook:          Can we talk to him?  Where's he at?

"Canevari:     Larry, Larry.

"Unknown:     Ma'am.

"Cook:          Ma'am, do me a favor, step on out here.

"Unknown:     Come on out.

"Canevari:     Larry.

"Cook:          Ma'am, ma'am.  Come out here.

"Unknown:     Ma'am, ma'am.  Come out here.

"Canevari:     Sorry.  Uh.

"Cook:          Larry, do me a favor, stand on up.

"Unknown:     [Unintelligible].

"Unknown:     Hey, Larry.

"Cook:          Walk on out this way Larry.  Don't grab anything, don't reach in
                your pockets.

"Canevari:     What the hell babe.  What happened?

"Roston:        [Unintelligible—makes noise].

"Cook:          Do me a favor Larry, turn around, put your hands on the wall, put
                your hands behind your back.

"Canevari:     What happened:  Please tell me.

9

passed from when Canevari answered the door to when Cook asked appellant to stand up. The volume of the voices on the tape indicate Canevari was close by the officers. These facts suggest that it was not far from the door of the house to where appellant was sleeping, and that Canevari accompanied the officers from one location to the other. There is no indication Canevari said anything to suggest she did not want the officers to enter the home. On the other hand, there is no way to tell from the transcript or the recording itself whether Canevari's nonverbal conduct expressed any desire to permit or prevent entry, and it is impossible to tell what was happening when the officers were asking her to "come out here."

If Canevari consented to the entry, of course, appellant's claim of ineffective assistance of counsel would fail because a suppression motion would not have succeeded. But even the ambiguity of the recording undermines appellant's claim: Had the suppression motion been made, the prosecution may well have been able to present other evidence demonstrating consent, such as testimony from one or more of the officers. In this context, it is appellant's burden to demonstrate the absence of consent.

Respondent also urges that the police entry into appellant's home was justified under the "exigent circumstances" exception to the warrant requirement. " ' "[E]xigent circumstances" means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.' " (*People v. Williams* (1989) 48 Cal.3d 1112, 1138, quoting *People v. Ramey, supra,* 16 Cal.3d at p. 276.) The relevant inquiry is "whether, in light of all of the circumstances, there was an objectively urgent need to justify a warrantless entry." (*People v. Rogers* (2009) 46 Cal.4th 1136, 1160-1161.) "Generally, a court will find a warrantless entry justified if

---

"Unknown:   We'll tell you, hang on ma'am."

10

the facts available to the officer at the moment of the entry would cause a person of reasonable caution to believe that the action taken was appropriate." (*Id.* at p. 1157.)

Here, the trial court reasonably could have concluded that the circumstances justified the warrantless entry. By proceeding to appellant's home as soon as he determined that appellant was the suspect in the assault and robbery, within two hours of the incident, Cook minimized appellant's opportunity to eliminate evidence of the offense. In fact, appellant was found wearing clothes that fit the description given by Maggio and Lewis of what the assailant was wearing, adding further weight to appellant's identification as the perpetrator. (See, *People v. Escudero, supra,* 23 Cal.3d at pp. 810-811, fn. 6 [distinctive shirt worn by suspect not significantly less 'disposable' than narcotics or other contraband].) Appellant argues that the fact Cook returned to the police station to prepare a photographic lineup demonstrates there would have been time to obtain a search warrant, but the lineup permitted Maggio to make the identification that gave Cook probable cause to arrest appellant. Prior to this photographic identification, Cook "thought" he knew the person Maggio was describing, but it was the photographic identification that confirmed Cook's suspicion. It does not appear there was "unjustified delay" during which an arrest warrant could have been obtained. (See, *People v. Williams, supra,* 48 Cal.3d at p. 1139.)

In any event, it is unnecessary for us to determine whether appellant in fact would have prevailed if his attorney had pursued the motion to suppress on Fourth Amendment grounds, nor whether counsel's choice to drop the motion was reasonable, because there is no reasonable probability the result at trial would have been more favorable to appellant if his statements had been excluded.

With respect to the assault, the evidence against appellant—without consideration of his own statements to Cook—was overwhelming. Maggio, who had gone to school with appellant, identified him as the assailant; Flores saw appellant assaulting Maggio. Appellant's argument at trial was that he assaulted Maggio but did not rob him. Thus, the only real question is the significance of appellant's statements to Cook on the issue of intent to rob.

11

Appellant argues that his statement was the crux of the prosecution's case, emphasized repeatedly in the prosecutor's closing argument as establishing appellant's intent to rob Maggio and also providing the basis for the prosecutor to argue that appellant's lies—telling Cook, for example, that he walked to Safeway alone rather than having driven with Flores, and saying he had not bought anything until Cook said the police had evidence he had done so—were evidence of his guilt. The latter point is of little consequence in terms of prejudice, as the lies did not in any way bear on appellant's intent and, as we have said, the evidence that appellant was the assailant was overwhelming. As to appellant's intent to rob Maggio, even without his own statements, the prosecution's case was very strong. Maggio, of course, described being robbed, and his story was corroborated by his torn pocket. Kirby heard Maggio yelling that he did not have any money, further corroborating that a robbery was in progress. And Flores's description of what appellant said when Flores asked him why he had assaulted Maggio was even more damning than appellant's own statement. Appellant's statement to Cook was that he was "a little upset" that he did not have any money on his card. Flores initially testified that when he asked why appellant had assaulted Maggio, appellant said he was "stressed out about needing money" and was "angry" and "took it out on the first person" he saw. Flores then acknowledged that he could have told the police appellant had said, "I'm mad, . . . I need someone's money."

Appellant argues that if his statement had been suppressed, he would not have had to take the stand to explain it. As appellant did *not* testify, this argument is difficult to comprehend.

Appellant also argues that if his statement had been suppressed he would have been free to attack Flores's credibility, suggesting that defense counsel did not vigorously challenge Flores's credibility because Flores's testimony was consistent with appellant's own statements. Further, appellant urges that in the absence of his statement, the defense could have highlighted Flores's motivation to testify against appellant in exchange for being given immunity from prosecution for his own role in the robbery. As it was, according to appellant, the jury heard only the prosecution's argument that while Flores's

12

criminal history might undermine his credibility in general, his motivation as appellant's friend was to minimize appellant's conduct, so that anything he said against appellant should be considered trustworthy.

The prosecutor reminded the jury of the stipulation it had heard setting forth Flores's criminal history, and explained that this history provided "insight into the guy" to help the jury decide whether he was "completely believable." The prosecutor explained that juries are informed of a witnesses "moral turpitude crimes" because "the law says if you commit a moral turpitude crime conduct or conviction that means you might have a readiness to do evil," which "bears directly on this guy's credibility." The prosecutor stated that Flores's record would make it easy to decide not to believe anything he said, and asked the jurors not to do this, pointing out that Flores made clear his interest in not hurting appellant.

Perhaps defense counsel could have attempted to persuade the jury that Flores's record made him an entirely untrustworthy witness, motivated to testify against appellant. But Flores's testimony completely supported the prosecutor's characterization. Flores plainly did not want to testify against appellant. Although he related appellant's statement about needing money, he tried to minimize what the prosecutor wanted him to say—that appellant said he needed "someone's" money—acknowledging that "if that's in the [police] report . . . I guess that's probably what I said" but reiterating that appellant was stressed and angry about needing money in general. Flores testified, "he was angry that night and it was bad time, you know. And shit happens, excuse my language." The prosecutor told Flores his demeanor suggested he was "having a little bit of trouble coming in and testifying about this" and asked if he did not want to testify, and Flores replied, "Well, I'm right here, you know, trying to keep it as honest as I can without him going, yeah." In the face of Flores's obvious discomfort, it would have been very difficult for the defense to have convinced the jury that Flores was manufacturing a statement to incriminate appellant. As it was, defense counsel tried to explain how Flores's testimony might be less damaging than it appeared: Counsel argued that it would have made no sense for appellant to have gotten into Flores's car saying "I need

13

someone's money" and instead he might have said "I need some money." Defense counsel also told the jury, regarding Flores's prior convictions, that it could not assume appellant to be a "bad guy" because he "hangs out with the bad guy."

Given Flores's description of appellant's statement in the car, which was more damaging than appellant's own statement, and the other evidence described above, there is no reasonable probability appellant would have achieved a more favorable outcome at trial if his statement to the police had been excluded. His claim of ineffective assistance of counsel thus fails. (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008-1010.)

## II.

Appellant additionally argues that the trial court abused its discretion in refusing to allow him to introduce evidence that Maggio had previously made false accusations of being victimized. Appellant's defense, as we have said, was that he assaulted Maggio but did not rob him. The only direct evidence of robbery came from Maggio. Appellant wanted to demonstrate that Maggio had mental or emotional problems that led him to believe, incorrectly, that he was being victimized in the Safeway incident.

At the time of trial, Maggio had a criminal case pending against him for violation of Penal Code section 653f, subdivision (a), on January 30, 2012, in which a question had been raised as to Maggio's competency to stand trial. The prosecution filed a motion in limine seeking to preclude the defense from presenting evidence of this competency question, arguing that competency to stand trial and competency to act as a witness are not determined by the same standard.

In response, appellant disavowed any intent to introduce evidence about the competency issue for the truth of the matter but sought to introduce evidence on a number of points in order to impeach Maggio's capacity to perceive and character for veracity. The points appellant raised were that Maggio had made previous claims of being a victim of criminal conduct that were not credible; Maggio was addicted to pain medication; Maggio had been unable to relate truthful facts of previous emergency situations; and Maggio had refused to acknowledge the trial court's authority "to return to court and to contact medical personnel regarding possible competency issues." The

14

motion stated that Maggio had previously claimed he was "under assault" by his doctor because the doctor would not prescribe more pain medication; that Maggio was facing criminal charges for abusing the 911 emergency dispatch system by making numerous 911 calls even after being admonished to stop by the dispatcher and being threatened with arrest by police officers; that Maggio told police officers his doctor was assaulting him by not providing him with two tetanus shots and three Benadryl shots he claimed to need before 10:00 a.m. the next morning to avoid serious illness, and told police officers, " 'I am being held hostage' by my doctor, you must arrest me now"; that Maggio then called 911 five times about " 'a seven-year problem surrounding a loan' " which he felt was a crime and as to which no report was taken; and that Maggio had refused to comply with court orders (issued by the same judge as in the present case) to report for two psychiatric evaluations, and had an outstanding court order for an arrest warrant for intentional failure to appear in court on these matters. In the present case, according to the motion, Maggio had continuously asked the investigating officer to sew his torn pocket; had testified at the preliminary hearing that he declined the option Officer Cook gave him of going to the hospital when in fact Cook had refused to take Maggio to the hospital because he had had multiple contacts with Maggio at the hospital in which Maggio demanded pain medication that the staff refused, indicating Maggio might be an addict; and Maggio had testified at the preliminary hearing that appellant stole his driver's license, then admitted on cross examination that he had added this information to his claim when he met with the investigating officer just before the hearing, and that in fact appellant did not steal his license.

With respect to the pending case, the court noted that any questioning would raise the issue of Maggio's Fifth Amendment privilege against self-incrimination, requiring the court to consider whether the probative value of the evidence would outweigh the time consumed by dealing with "all the circumstances surrounding this and also dealing with Fifth Amendment privilege and also dealing with potential immunity proceedings." The court questioned the probative value of the evidence because the facts underlying the pending case occurred some four months before the present incident. The court did not

15

view Maggio's statements to the 911 dispatcher and police as having much probative value absent proof that the statements were in fact false, and did not want to have a "mini-trial" concerning the pending case.

The trial court ruled that the defense could ask Maggio about his expectations in the pending case and whether any promises of leniency had been made to him, but not about the underlying facts. The court stated that defense counsel would be permitted "vigorous cross-examination to go into his emotional and mental stability" but not necessarily to address the pending case for that purpose. Regarding addiction to pain medication, the court noted that evidence of a witness's drug addiction is admissible only if it tends to show the witness was under the influence while testifying or when the events being related occurred, or that the witness's mental faculties were impaired by use of the drugs.

Evidence Code section 352 gives the trial court discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " 'A trial court's exercise of discretion under section 352 will be upheld on appeal unless the court abused its discretion, that is, unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner.' (*People v. Thomas* (2012) 53 Cal.4th 771, 806.)" (*People v. Suff* (2014) 58 Cal.4th 1013, 1066.)

Appellant views the evidence he sought to present as relevant and necessary to demonstrate that Maggio had a propensity to exaggerate claims of being criminally victimized, thereby supporting appellant's defense that he assaulted but did not rob Maggio. We disagree with appellant's view of the probative value of the proposed evidence and, therefore, find no basis to fault the trial court's exercise of discretion.

While evidence of a person's character or trait of character is generally inadmissible to prove his or her conduct on a specified occasion (Evid. Code, § 1101, subd. (a)), this rule does not make inadmissible "evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific

16

instances of conduct) of the victim of the crime for which the defendant is being prosecuted . . . if the evidence is [¶] [o]ffered by the defendant to prove conduct of the victim in conformity with the character or trait of character." (Evid. Code, § 1103, subd. (a)(1).) Pursuant to this rule, for example, in a rape prosecution, evidence that the victim has previously made false accusations of rape may be highly probative. (*People v. Adams* (1988) 198 Cal.App.3d 10, 16-17, 19; *People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 597-600.) Similarly, in a prosecution for sexual assault, *People v. Randle* (1982) 130 Cal.App.3d 286, 295-296, found error in the exclusion of evidence that the victim had previously made false claims of being the victim of a purse snatch and of having been kidnapped at the same bar and restaurant where the charged offenses were alleged to have occurred. On the other hand, where the evidence of past conduct has little probative value on the issue for which it is introduced, a trial court does not abuse its discretion in excluding evidence that would be admissible under this statute. (*People v. Covino* (1980) 100 Cal.App.3d 660, 666 [evidence that victim of sexual assault aggressively sought attention from men, hugged and kissed men in a public place, and encouraged men to take her home not probative on question whether sex with defendant was consensual].)

Maggio's complaints to 911 and police officers bear no similarity to the charged offenses in the present case. Appellant characterizes the prior reports as false or exaggerated claims of being the victim of criminal offenses. But it is obvious that those reports were not referring to anything like the assault and robbery here. The claim of having been "assaulted" by his doctor's failure to provide the treatment Maggio believed he needed did not portray Maggio as the victim of a criminal offense; it expressed frustration and distress over a perceived lack of medical care. Further, as the trial court discussed, the defense had no basis for anything other than speculation as to the truth or falsity of Maggio's belief that he needed the treatment in question. To the extent the reports of a loan "problem" Maggio believed to be a crime could be seen as an actual report of a criminal offense, again, the defense had no information regarding the validity of the claim. The evidence simply does not appear to cast light on the issue for which

17

appellant sought to use it—Maggio's ability to perceive, during a physical assault, whether he was being robbed or merely assaulted.

Appellant takes issue with the trial court's emphasis on the past complaints having been made several months before the present incident, seeing this as too recent to support the trial court's view of them as "remote." But the trial court's point was that Maggio's mental state was only relevant, for appellant's purposes, to the extent it had bearing on his ability to perceive and communicate at the time of the incident. Even if the past complaints reflected an impairment causing Maggio to misperceive himself as a victim, without a similarity in circumstances or explanation of what might cause the prior kind of misperception to operate in the present circumstances, the several month time difference served to further undermine the probative value of the evidence.

At the same time, the proposed evidence would have brought into the present case the as yet untried charges against Maggio for abuse of the 911 system, raising issues about Maggio's constitutional privilege against self incrimination, as well as the potential for undue consumption of time. Significantly, the trial court did *not* preclude appellant from cross-examining Maggio concerning his mental state and ability to perceive and relate the incident. On the contrary the court said it would permit "vigorous" cross-examination in this area. The court only precluded evidence concerning the pending case against Maggio.

Appellant's contention that the trial court violated his constitutional rights to cross examine and to present a defense is unavailing. Portraying the court's ruling as precluding him from cross-examining Maggio, the sole witness to the disputed element of theft, on his ability to perceive and relate the events, appellant relies upon *Franklin v. Henry* (9th Cir. 1997) 122 F.3d 1270 to argue that evidence of Maggio's prior accusations "would have shown [the complaining witness] capable of fantasies about [others] analogous to the charges [he] made against [appellant]." (*Id.* at p. 1273.) As with the cases we have already discussed, the similarity between the prior accusations and charged conduct in *Franklin* is in no way matched in the present case. In *Franklin,* the defendant was accused of molesting the five-year-old daughter of a friend with whose

18

family the defendant had lived for several months.  Six months after the defendant left the household, the child reported that he had "licked her 'private' and made her lick his 'private.' " (*Id.* at p. 1271.)  The trial court refused to permit the defendant to testify that in his presence, the child told her brothers that the previous night "her mother had come into her room and 'licked her private.' " (*Id.* at p. 1272.)  The California Court of Appeal found the ruling error, but harmless, and the Supreme Court denied review.  (*Ibid.*)  The Ninth Circuit granted the defendant's petition for habeas corpus, finding the error was of constitutional magnitude and prejudicial.  (*Id.* at p. 1273.)  The *Franklin* court emphasized that the prosecutor's case was "not a strong one" and rested on whether the jury believed the child, and that, if believed, the defendant's testimony would have shown the child "capable of fantasies about her mother analogous to the charges she made against" the defendant.  (*Id.* at p. 1273.)  Therefore, exclusion of the evidence "deprived [the defendant] 'of the basic right to have the prosecutor's case encounter and "survive the crucible of meaningful testing." ' " (*Ibid.*, quoting *Crane v. Kentucky* (1986) 476 U.S. 683, 690-691.)  For the reasons above, the present case does not rise to this level.[5]

---

[5] Having reached this conclusion, we need not consider respondent's argument that appellant forfeited his constitutional claim by failing to raise it in the trial court, or appellant's argument that this failure by defense counsel constituted ineffective assistance of counsel.

## DISPOSITION

The judgment is affirmed.

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Brick, J.*

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.